UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
BAKARY FOFANA                        :
                                     :
                  Plaintiff,         :
                                     :
                                     :   10 Civ. 0071 (LTS)(THK)
                                     :
          -against-                  :   **REPORT AND RECOMMENDATION**
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF SOCIAL SECURITY,     :
                                     :
                  Defendant.         :
------------------------------------X

**TO:   HON. LAURA T. SWAIN, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Bakary Fofana ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's determination that he was not eligible for disability insurance benefits.   Defendant, the Commissioner of Social Security ("the Commissioner"), has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and Plaintiff has cross-moved for judgment on the pleadings.   These motions were referred to this Court for a Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(a) of the Local Civil Rules of the Southern District of New York.   For the reasons that follow, the Court recommends that the Commissioner's motion be denied, that Plaintiff's motion be granted in part, and the action be remanded for further development of the record.

1

COPIES MAILED
TO COUNSEL OF RECORD ON  8/9/11

**BACKGROUND**

## I.   Procedural Background

Plaintiff applied for disability insurance benefits on November 21, 2006. (See Record ("R.") at 130.)   In his application, Plaintiff claimed that his disabling condition, relating to a psychiatric disorder, began on December 15, 2005. (See id. at 130, 145.)   Finding that Plaintiff was not disabled under Social Security Administration ("SSA") rules, the SSA initially denied his application on March 20, 2007, and again upon reconsideration on May 4, 2007. (See id. at 89-92, 94-97.) Plaintiff contested the decision and a hearing was held before Administrative Law Judge Mary G. Dilley (the "ALJ") on March 19, 2009. (See id. at 25-84, 98-114.)   In a decision dated August 3, 2009, the ALJ found that Plaintiff was not disabled, and affirmed the SSA's initial denial of benefits. (See id. at 6-24.)   The ALJ's ruling became a final decision of the Commissioner when, on October 8, 2009, the Appeals Council denied Plaintiff's request for review. (See id. at 1-3.)   This action followed.

## II.  Factual Background

Plaintiff is a 54-year-old man who was born in Gambia on March 15, 1958. (See id. at 30.)   He currently resides in Manhattan. (See Complaint ("Compl.") ¶ 2.)   Plaintiff attended school in Gambia until the twelfth grade, and has lived in the

United States for about ten years. (<u>See</u> R. at 31-32.)   Plaintiff
studied English as a second language at a community college, but
states he is unable to read or write well in English. (<u>See</u> <u>id.</u>)
Plaintiff worked as a laborer for various employers from 1997 to
1999, and as a janitor from 1976 to 1994. (<u>See</u> <u>id.</u> at 33-37,
146.)   In 1998, while Plaintiff was working for the City of
Seattle Parks Department, he was in an automobile accident and
sustained a back injury that rendered him unable to work for a
period of time. (<u>See</u> <u>id.</u> at 56-57, 296, 335.)   Plaintiff went
back to work as a parking valet, from 2000 to 2005. (<u>See</u> <u>id.</u> at
146.)   After losing his job, he did not resume employment and,
since 2005, Plaintiff has earned a total of $573.46. (<u>See</u> <u>id.</u> at
133-34.)

    With his application for disability benefits, Plaintiff
submitted three "Function Reports" that described his daily
activities and abilities. (<u>See</u> <u>id.</u> at 152-77.)   In the first
Function Report ("Report One") completed by Plaintiff on October
10, 2006, he reported that he lived alone and did not take care
of anyone. (<u>See</u> <u>id.</u> at 152-53.)   He cleaned his home, prepared
his own meals, went out alone, drove a car, and socially
interacted with other people. (<u>See</u> <u>id.</u> at 152-56.)   Plaintiff
claimed that his ability to lift, sit, and talk are affected by
his condition. (<u>See</u> <u>id.</u> at 157.)   Plaintiff stated that he can

3

lift ten pounds, needed a rest after walking one mile, and could pay attention for thirty minutes. (See id.)  Plaintiff's sleep was not affected by his condition, and he reported no unusual behavior or fears. (See id. at 153, 158.)  He claimed to be able to follow spoken instructions and was able to get along with authority figures. (See id. at 157.)

Plaintiff's answers in the second Function Report ("Report Two") and third Function Report ("Report Three"), were both completed with the assistance of Peter Kabba. (See id. at 161-77.)  In Report Two, completed on December 29, 2006, Plaintiff reported that he took care of his wife, mother, and son. (See id. at 162.)  In Report Three, Plaintiff reported that he took care of others by giving them food, money, clothes, and support for their needs. (See id. at 170.)  In Report Two, as in Report One, Plaintiff reported that he spent his day cleaning. (See id. at 152, 161.)  In Report Three, completed on January 7, 2007, he reported that he spent his day reading, praying, and watching TV. (See id. at 169.)  In Reports Two and Three, Plaintiff claimed that his sleep is affected by his condition, and he needs reminders and help to take care of his personal needs, encouragement to clean his home, and help in preparing his meals. (See id. at 162-63, 170-71.)  In Report Two, Plaintiff reported

4

that he did not engage in social interactions with others, but was able to walk, drive a car, ride in a car, and use public transportation. (See id. at 164-65.)  In Report Three, he claimed that he was able to do all of these activities except drive a car. (See id. at 172-73.)

In Report Two, Plaintiff stated that his condition affected his memory, his ability to talk, hear, complete tasks, concentrate, understand, follow instructions, and his ability to get along with others. (See id. at 166.)  In Report Three, Plaintiff reported that his condition affected his memory and his ability to talk, understand, and concentrate. (See id. at 174.) In Reports Two and Three, Plaintiff claimed that he did not know how far he could walk before needing a rest, or for how long he could pay attention. (See id. at 166, 174.)  Plaintiff reported paranoia, nervousness, and inability to understand in Report Two (see id. at 167), and, in Report Three, that he scares people and is nervous (see id. at 175).

## III. Medical Evidence

### A. Physical Evaluations

In March 1998, after Plaintiff was in an automobile accident, he was evaluated in the Emergency Department at Northwest Hospital in Seattle. (See id. at 296, 335.)  After the

accident, Plaintiff began to "immediately" experience lower back pain. (See id. at 335.)   Plaintiff was believed to have suffered a moderately severe lumbosacral strain and sprain. (See id. at 296, 335.)   He also had a broad-based disc bulge with a small right-sided focal protrusion near the thecal sac at the origin of the L5 root. (See id. at 225, 335.)   Plaintiff's condition was followed between 2000 and 2004 by Dr. Stan Schiff, a neurologist, who prescribed Amitriptyline and Methocarbamol. (See id. at 335.)

On May 11, 2004, a CT scan of Plaintiff's spine was conducted at Harborview Medical Center ("HMC"). (See id. at 402.) The scan indicated that in the cervical region, Plaintiff had degenerative retrolisthesis, multilevel cervical spondylosis with degenerative disc disease, osteophytosis, and calcification of the longitudinal ligament. (See id.)   Osteophytosis was found in the thoracic and lumbar region, and spina bifida occulta was also found in the lumbar region. (See id.)   At that time, Plaintiff was instructed to continue taking Amitriptyline and Methocarbamol for his pain. (See id. at 336.)   In July and August 2004, Plaintiff continued to take Amitriptyline and reported that it was "helpful." (See id. at 331, 328.)

Plaintiff returned to HMC in January 2005, and was referred to physical therapy for his chronic back pain. (See id. at 320.)

6

On February 15, 2005, Plaintiff returned to HMC, informed the nurse practitioner that: "he continues working part time as a janitor," but wanted a letter stating that he was medically unable to work, so he could collect unemployment to pay his rent. (See id. at 222, 316.)  Plaintiff attended physical therapy at HMC from January to May 2005, but missed several sessions. (See id. at 338-72.)   Plaintiff engaged in an independent home exercise program and was walking for 20-30 minutes five times per week. (See id. at 338.)   A therapy note indicates that his leg pain increased after walking for two hours. (See id. at 340.)   On May 11, 2005, Plaintiff's physical therapy discharge note reported some improvement, but that he continued to have difficulties and "would likely" need physical therapy in the future. (See id. at 338-39.)

In March 2006, Dr. Jonathan Jackson, an HMC doctor, reported that Plaintiff's lower back pain was "under control with ibuprofen," and that his objective vital signs showed that his neck was "supple." (See id. at 232-34, 305-07.)   Dr. Britt Anderson examined Plaintiff in March 2007 and reported that there was no sign of back or spine abnormality. (See id. at 417.) Plaintiff had "normal" flexion and extension, but his "lateral flexion [was] dramatically diminished." (See id.) Also, his

spinous processes were "nontender," his trapezuis muscles were "very tight," and his paraspinous muscles were "almost rigid." (See id.)  Dr. Anderson diagnosed "uncertain" muscle spasm and was unsure why Plaintiff was so tight. (See id.) Plaintiff was referred to physical therapy for "biomechanics and stretching exercises." (See id.)

On February 7, 2007, Plaintiff visited Dr. Luis Wainstein for an SSA consultative exam. (See id. at 243-48.)  Dr. Wainstein noted during the exam that Plaintiff showed no signs of distress while in a sitting position, partially bent his lower back to remove his shoes, removed his pants in a sitting position, held his back straight, showed no limitations getting on and off the examination table, but showed some discomfort when he laid down on the examination table. (See id. at 245.)  There was no indication of limitations in Plaintiff's gait or ability to walk on his toes. (See id. at 246.)  He was also able to squat two-thirds of the way down, but complained of back stiffness. (See id.)  Plaintiff's deep tendon reflexes were a 3+ on a scale of 4. (See id. at 247.)  No joint deformity or effusion was found, but Plaintiff "almost jumped" when Dr. Wainstein "simply massaged the lower lumbar area before even starting with tenderpoints." (See id.)  Dr. Wainstein diagnosed Plaintiff with "residual low back pain" and a "diminished range of motion but no evidence of

8

radiculopathy." (See id.)   He also noted that Plaintiff had a history of neck injury, but "no obvious symptoms." (See id. at 248.

On March 14, 2007, Dr. Robert Bernardez-Fu completed a physical residual functional capacity assessment for Plaintiff. (See id. at 251-58.)   He reported that Plaintiff showed some signs of exertional limitations: he could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours, and sit for about six hours. (See id. at 252.)   Plaintiff could push or pull an unlimited amount, apart from his limitations in lifting and carrying. (See id.) He also showed signs of postural limitations: he could frequently balance, occasionally climb ramps or stairs, occasionally stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (See id. at 253.)   It was also determined that Plaintiff should avoid concentrated exposure to vibrations and hazards, such as machinery and heights. (See id. at 255.)

In May 2007, Mr. Brett Nelson, Plaintiff's physical therapist, informed Dr. Anderson that after three sessions, Plaintiff was "essentially unable to tolerate even the most basic of exercise." (Id. at 421.)   He grimaced in severe pain with all positions, movement transitions, and exercise. (See id.)   Mr. Nelson stated that Plaintiff's "response [was] out of proportion

9

to any musculoskeletal pain syndrome that [he was] aware of."
(Id.)  Plaintiff visited Dr. Anderson for a follow-up examination
on June 18, 2007. (See id. at 416.)  Plaintiff had "[n]o skeletal
tenderness or deformity, and easily moved around the clinic
without signs of pain." (Id.)  Dr. Anderson diagnosed Plaintiff
with Fibromyositis and recommended that Plaintiff continue to
exercise and undergo psychological evaluation. (See id.)   On
September 18, 2007, Dr. Anderson referred Plaintiff for a back x-
ray. (See id. at 411-12.)   The x-ray showed that Plaintiff had
mild post-traumatic or degenerative changes to the L3 vertebral
body and possible left sacroilitis. (See id. at 428.)

     In February 2008, Dr. Jackson completed a medical
questionnaire regarding Plaintiff's medical condition. (See id.
at 513-16.)   Dr. Jackson reported that Plaintiff's back, gait,
and station were within normal limits. (See id. at 514.)
Plaintiff showed no signs of limitations in his agility,
mobility, flexibility, or signs of non-exertional environmental
or workplace restrictions (such as visual, hearing or pulmonary
restrictions). (See id.)

10

B. <u>Mental Evaluations</u>

In May 2004, Dr. Mark Koenen, a psychiatrist at HMC, noted that Plaintiff had a GAF of 40[1] and a possible schizoaffective disorder. (<u>See</u> <u>id.</u> at 298.)  He prescribed Plaintiff Risperidone for his hallucinations. (<u>See</u> <u>id.</u>)  On July 13, 2004, Dr. Paul David Boutin, a psychiatrist at HMC, examined Plaintiff and found that Plaintiff was "psychotic, and depressed, possibly suffering from a psychotic depression." (<u>Id.</u> at 390-92.)  After Plaintiff reported thoughts of self-harm and paranoia, Dr. Boutin referred Plaintiff to the Crisis Triage Unit ("CTU") at HMC for assessment and a possible inpatient stay. (<u>See</u> <u>id.</u>)  Upon arrival at the CTU, Plaintiff had "pressured" speech, "depressed" mood, "irritable" affect, and "bizarre" thought process. (<u>See</u> <u>id.</u> at 277.)  He also appeared "guarded," "asked to leave the Emergency room," and was hospitalized on an involuntary basis. (<u>See</u> <u>id.</u> at 275-76, 281.)  While hospitalized, Plaintiff tested positive for marijuana and admitted to smoking marijuana on a regular basis.

---

[1] GAF 31-40 is defined as "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. text revision 2000) (hereinafter "<u>DSM-IV-TR</u>").

(See id. at 276-77.)   Plaintiff also underwent a head CT-scan

that showed "no acute intracranial abnormalities." (See id. at

275, 399.)   During the hospitalization, Plaintiff denied suicidal

ideation and showed no signs of "psychotic internal stimuli" or

auditory hallucinations. (See id. at 278.)   The Mental Health

Court voluntarily dismissed Plaintiff after seventy-two hours.

(See id.)   Plaintiff was prescribed a thirty-day supply of

Risperdal, and it was reported in his discharge summary that he

had a GAF of 30[2] upon admission and a GAF of 60[3] upon discharge.

(See id. at 275.)

On July 22, 2004, Plaintiff returned to HMC for a follow-up

with Ms. Cheri Gail, an Advanced Registered Nurse Practioner.

(See id. at 331-32.)   Plaintiff reported that he was "feeling

very good," and denied hearing voices or having suicidal

ideation. (See id. at 331.)   He also reported that he was smoking

marijuana two times a week. (See id. at 332.)   On October 7,

2004, Ms. Gail restarted Plaintiff on Risperidone and increased

---

[2] GAF 21-30 is defined as "[b]ehavior that is considerably
influenced by delusions or hallucinations or serious impairment
in communication or judgment (e.g., sometimes incoherent, acts
grossly inappropriately, suicidal preoccupation) OR inability to
function in almost all areas (e.g., stays in bed all day; no job,
home, or friends)." DSM-IV-TR, at 34.
[3] GAF 51-60 is defined as "[m]oderate symptoms (e.g., flat affect
and circumstantial speech, occasional panic attacks) OR moderate
difficulty in social, occupational, or school functioning (e.g.,
few friends, conflicts with peers or co-workers)." Id.

his dosages of Amitriptyline and Risperidone. (See id. at 325-26.)   Plaintiff reported that he continued to smoke marijuana. (See id. at 326.)   In October 2004, Dr. Lorin Gardiner, a psychiatrist at HMC, noted that Plaintiff had responded to Risperidone, but continued to talk to himself frequently, possibly due to anxiety. (See id. at 387-88.) Plaintiff was prescribed Trazadone for his insomnia. (See id. at 388.)   In late October 2004, Dr. Gardiner noted that it was unclear whether Plaintiff was hearing voices or "talking to himself internally." (Id. at 385.)   Plaintiff's dosage of Trazadone was increased. (See id.)   In November 2004, Plaintiff's dosage of Risperidone was increased to control his "ruminative thoughts." (See id. at 382-83.)   Plaintiff was also started on Zoloft later that month. (See id. at 380.)

     In January 2005, Dr. Gardiner noted that Plaintiff's condition had "deteriorated somewhat since he ran out of medication." (See id. at 377.)   Plaintiff asked Dr. Gardiner for a letter for his employer, stating that he could not work for a month, but Dr. Gardiner told Plaintiff there was a possibility that his condition would improve with medication and when he got more sleep. (See id. at 377-78.)   He was told "that with more adequate sleep he would probably find that he feels less dizziness and more able to work." (Id. at 378.)   Plaintiff

13

continued to take Risperidone and was restarted on Sertraline and Trazodone. (See id. at 378.)   In January and March 2005, Dr. Gardiner noted that Plaintiff's symptom of talking to himself seemed more "obsessive-compulsive in nature." (See id. at 375, 377.)

On March 3, 2006, Dr. Jamie Gray, a doctor at HMC, reported that Plaintiff's mood was "well." (See id. at 310.)   Plaintiff first reported that he was taking his medication, but then reported that he had not taken any medication for about a year because he did not think he needed it. (See id.)   On March 15, 2006, Dr. Jackson reported that Plaintiff's depression was "much improved on his current regimen." (See id. at 234.)

Plaintiff visited Dr. Allen Lee for an SSA consultative psychiatric exam on February 3, 2007. (See id.  at 239-42.)   Dr. Lee noted that Plaintiff's chief complaint was that he "can't work," and he reported that he had chronic back pain, headaches, and right foot pain. (See id. at 240, 242.)   Plaintiff spoke at a normal rate and rhythm. (See id.)   His mental activity was linear, but he showed poverty of thought. (See id. at 241.)   His affect was flat and his three-step command was poor.   His orientation seemed intact to time and place.   Plaintiff's serial

14

7s were intact to 5/5 digits,[4] but he could not articulate the similarities and differences between an apple and an orange. His concentration, persistence, and pace were poor throughout the interview. (See id.)

Dr. Lee noted that Plaintiff's abilities to manage funds, perform simple and repetitive tasks, perform detailed and complex tasks, and to accept instructions from supervisors were poor. (See id. at 242.)   Plaintiff's ability to interact with coworkers, perform work activities on a consistent basis, and maintain regular attendance in the workplace were likely to be severely affected. (See id.)   His ability to deal with the stresses of work, however, was likely only to be mildly affected. (See id.)   Dr. Lee noted that Plaintiff's limited abilities were due to his "cognitive ability," but may also relate to psychotic depression. (See id.)   Plaintiff had a GAF of 40. (See id.)   Dr. Lee noted that Plaintiff's DSM diagnosis revealed that he suffered from a cognitive disorder due to traumatic brain injury and a non-specified mood disorder. (See id. at 241-42.)

On March 14, 2007, Dr. Steven Haney completed a psychiatric review technique and assessed Plaintiff's medical history. (See id. at 259-72.)   Dr. Haney reported that Plaintiff had indicated

_____

[4] Serial 7s is a mental exam where the person counts down from 100 by 7s.

15

in an earlier exam that he was hospitalized psychiatrically many times; yet, Plaintiff's medical records showed only one hospitalization in 2004. (See id. at 271.) Plaintiff also told Dr. Lee that he only used cannabis socially from 2000 to 2003, yet he reported in July 2004 that he was using cannabis on a regular basis. (See id.) Dr. Haney reported that Plaintiff could consistently carry out short and simple instructions, had mild limitations in maintaining social functioning, and had moderate limitations in maintaining concentration, persistence, or pace. (See id. at 269, 271.) Dr. Haney diagnosed Plaintiff with depression and noted that the medical reports that diagnosed Plaintiff with a cognitive disorder were not credible, as it was assumed that the alleged cognitive disorder stemmed from Plaintiff's car accident in 1998, yet Plaintiff worked between 1990 and 2005. (See id. at 262, 271.)

Dr. Luci Carstens completed a psychological/psychiatric evaluation of Plaintiff on April 4, 2007. (See id. at 488-93.) Plaintiff denied any past or current use of drugs. (See id. at 488.) A DSM diagnosis revealed that Plaintiff suffered from a severe major depressive disorder with no signs of psychosis, but that it was controlled by medication. Dr. Carstens made a provisional diagnosis of cognitive disorder. (See id. at 489.)

Plaintiff had a GAF of 45.[5] (See id.) Plaintiff scored 14 out of 30 on a mental status exam, indicating markedly compromised cognitive functioning. He was oriented to person and place, but not to time. He had difficulty recalling 3 out of 3 items immediately, and could not recall any items after a three-minute delay. He was unable to perform serial 7s, had difficulty following three-step commands, but was able to follow simple verbal commands without difficulty. (See id. at 490.) Plaintiff's cognitive factors showed no limitations in his ability to understand, remember, and follow simple instructions, but showed moderate limitations in his ability to perform complex instructions and routine tasks. (See id.) Plaintiff showed marked limitations in his ability to learn new tasks, exercise judgment, and make decisions. (See id.) Plaintiff's social factors showed mild limitations in his ability to interact appropriately with the public and to care for himself, including keeping up with personal hygiene and appearance. (See id.) Plaintiff showed moderate limitations in his ability to control physical or motor movements and maintain appropriate behavior. (See id.) Plaintiff also showed marked limitations in his

---

[5] GAF 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR, at 34.

ability to appropriately relate to co-workers and supervisors and to respond appropriately and tolerate the pressures and expectations of a normal work setting. (See id.) Dr. Carstens noted that Plaintiff's major limiting factor appeared to be marked cognitive defects. She concluded that Plaintiff was acutely mentally ill and it was unlikely that Plaintiff's capacity to work would improve over time with treatment. (See id. at 491.)

On September 18, 2007, Dr. Anderson noted that Plaintiff was anxious and unhappy, and diagnosed Plaintiff with an unspecified schizoaffective disorder. (See id. at 411-12.) In December 2007, Dr. Jackson restarted Plaintiff on Risperidone and Zoloft. (See id. at 446.)

In January 2008, Dr. Jackson, whose specialty is in internal medicine, prescribed Plaintiff Prazosin to assist with Plaintiff's complaints of nightmares and panic disorder. (See id. at 442.) Dr. Jackson noted that Plaintiff should continue with Zoloft and Risperidone for his depression and psychotic features. (See id.) In February 2008, Dr. Jackson completed an evaluation regarding Plaintiff's condition for the Washington State Department of Social and Health Services. (See id. at 513-14.) Dr. Jackson described Plaintiff as showing psychotic features with possible schizophrenia. Plaintiff's response to treatment

18

for psychotic features and possible schizophrenia resulted in "some control of [his] depression and psychotic features." (See id. at 514.)   Also, depending on the day, Plaintiff suffered moderate to severe limitations in his ability to hear, communicate, and understand or follow directions. (See id. at 515.)  Dr. Jackson noted that Plaintiff would need a psychiatric evaluation and "pharmaceutical therapy" to improve his employability. (See id. at 516.)

Dr. Charles Quinci, a psychologist, completed a psychological/psychiatric evaluation of Plaintiff on September 9, 2008. (See id. at 504-12.)   At the time, Plaintiff was not receiving mental health care.  Plaintiff had moderate symptoms of depressed mood, verbal expression of anxiety or fear, and hallucinations. (See id. at 505.)  In a medical source statement, Dr. Quinci noted that Plaintiff had moderate cognitive impairment, orientation to time impairment (Plaintiff did not know the date or year), poor social functioning, difficulty in carrying out routine tasks, and poor coping and stress tolerance skills. (See id. at 509.)  Dr. Quinci also diagnosed atypical psychosis. (See id. at 505.)  Dr. Quinci opined that mental health intervention was likely to restore or substantially improve Plaintiff's ability to work for pay in a regular and productive manner. (See id. at 507.)

19

On September 10, 2008, Plaintiff visited Dr. Jackson to re-establish care. (See id. at 434.)   Dr. Jackson noted that Plaintiff's auditory hallucinations were "under pretty good control." (See id.)   Plaintiff still heard voices, but reported that he felt "more comfortable and in control of them." (See id.)   Plaintiff was not "profoundly depressed" and had no suicidal ideation. (See id.)   Dr. Jackson also noted that Plaintiff was "taking care of himself" and eating. (See id.)   Dr. Jackson re-filled Plaintiff's prescriptions for Risperidone, Zoloft, and Prazosin. (See id.)

On February 25, 2009, Dr. Carstens did a second evaluation. (See id. at 495-500.)   At this later evaluation, Dr. Carstens diagnosed Plaintiff with a severe major depressive disorder with psychosis (partially controlled by medication), a cognitive disorder, and a non-specified psychotic disorder.   (See id. at 495.)   She rated his global illness based on the intensity and pervasiveness of his symptoms and the impairment of functioning as "marked."   Plaintiff's GAF was rated at 45, where a GAF of more than 53 was assumed necessary to maintain employment. (See id.)   Plaintiff showed lapses in memory for recent and remote events, and demonstrated limited insight and social judgment. Plaintiff was able to repeat 3 digits going forward (which is considered to be in the deficient range) and could not recall any

digits going backward.  He was oriented to person and place, but
not fully oriented to time.  Dr. Carstens concluded that
Plaintiff showed marked limitations in the ability to relate
appropriately to co-workers and supervisors and marked
limitations in his ability to respond appropriately to the
pressures and expectations of a normal work setting.  (See id. at
496.)  Dr. Carstens also concluded that while mental health
support would benefit Plaintiff, "his marked cognitive deficits .
. . are considered to be the major limiting factor to his
employability." (Id.)

In April 2009, Dr. Clayton reviewed Plaintiff's record to
complete a medical source statement on Plaintiff's ability to do
work-related activities based on his mental condition.  (See id.
at 542-44.)  She opined that Plaintiff showed no limitations in
his ability to understand and carry out simple instructions, but
moderate limitations in his ability to carry out complex
instructions.  (See id. at 542.)  Plaintiff showed mild
limitations in his ability to make judgments on complex work-
related decisions and to appropriately respond to routine changes
in a work setting.  (See id. at 542-43.)  He showed mild
limitations in his ability to appropriately interact with
supervisors and coworkers.  (See id. at 543.)  In April 2009, Dr.
Clayton also completed a psychiatric review technique.  (See id.

21

at 545-56.) She diagnosed Plaintiff as having an affective disorder in the form of depressive syndrome. (See id. at 548.) Without examining Plaintiff, she reported that Plaintiff had mild restrictions on his daily living activities, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (See id. at 554.)

## IV.  The Administrative Hearing

On March 19, 2009, Plaintiff appeared before Administrative Judge Mary Gallagher Dilley, and was represented by Alexandria Doolittle. (See id. at 27.) Plaintiff testified that up until 2005, he worked as a valet for Enterprise and Aamco, where he washed, parked and retrieved cars, and sat in the ticket booth. (See id. at 33-34, 53.) Plaintiff never used the cash register while he worked as a valet. (See id. at 53.) Plaintiff testified that he got along with all of his coworkers, but that he had problems with one boss. (See id. at 51-52.) Plaintiff testified that while he worked as a valet, he would sometimes bring a customer the wrong car because he had trouble memorizing the correct license plate number. (See id. at 52-53.) Plaintiff testified that he was eventually laid off because he did not come to work on time. (See id. at 52-53.)

Plaintiff testified that he lives alone and that his daily activities include walking to the Millionaire's Club for a free

22

breakfast, going to church, watching TV, reading the Koran for about an hour, and sleeping. (See id. at 38-43.) Plaintiff testified that he does not cook or clean, but that his cousin helps him with these activities. (See id. at 40-44.) He also testified that his cousin reminds him to shower, but that he showers, dresses, and uses the bathroom by himself. (See id. at 44-45). Plaintiff testified that he does not have many friends, but the ones he does have visit him. (See id. at 51.) He, however, does not visit them because he does not have money for the bus. (See id.) The ALJ questioned Plaintiff about his history of marijuana use, and Plaintiff stated that he had quit and did not smoke from 1999 to 2004. (See id. at 46-47.)

Plaintiff testified at the hearing that he never had mental or physical health problems before the 1998 automobile accident. (See id. at 58.) He testified that his depression comes and goes, and that he usually feels bad one to two days a week. (See id. at 54-55.) Further, he began to hear voices that "come and go" after the automobile accident. (See id. at 55-56.) He can, however, only hear the voices; he does not talk to them. (See id. at 56.) He testified that he lived with his cousin for a period of time because he was having problems with his dreams, and the doctors were concerned that he might kill himself. (See id. at 62.) He also has trouble sleeping due to bad dreams, but that

23

his medication helps some. (See id. at 48.)   He also testified
that he diligently takes his medication. (See id. at 48-49.)   Due
to his back pain that began after the 1998 accident, he cannot
squat, crawl, bend at the waist, or lift anything heavier than a
gallon of milk. (See id. at 58-61.) Plaintiff testified he was
able to climb one flight of stairs, stand for about an hour or
two, sit for less than two hours, reach, and walk slowly. (See
id. at 60-61.)

Dr. Sally Clayton, a medical expert and clinical
psychologist who had read Plaintiff's record but never examined
him, testified at the hearing. (See id. at 63-77.)   She stated
that the record contained evidence that Plaintiff has a
depressive disorder with some kind of "occasional psychotic
symptoms." (See id. at 65.)   She also noted that Plaintiff's
symptoms have "waxed and waned." (See id.)   When Plaintiff's
symptoms are at their worst, he would meet the criteria for
anhedonia, sleep disturbance, low energy, feelings of guilt, and
difficulty concentrating. (See id. at 65-66.)   Dr. Clayton opined
that Plaintiff has the following limitations:  his activities in
daily living are mildly impaired; his social functioning is
moderately impaired; his concentration, persistence, and pace are
moderately impaired. (See id. at 66.)   Based on these
limitations, Dr. Clayton opined that Plaintiff would be limited

24

to unskilled and simple work at the minimum. (See id. at 69.)
Dr. Clayton agreed with Dr. Haney's opinion that Plaintiff has
the ability to carry out short and simple instructions in a
reasonable manner. (See id. at 70.)  She also did not note any
signs of socially inappropriate behavior, and thought that
Plaintiff's limitations in interacting with the public are
related to a language barrier. (See id.)

    Dr. Clayton testified that Plaintiff's language barrier may
account for some of the inconsistencies in the record. (See id.
at 76.)  Dr. Clayton stated that it was difficult to reconcile
all the inconsistencies in the medical record, especially
Plaintiff's memory difficulties that do not "fit any usual
pattern even for a head injury." (See id. at 67.)  She also
testified that it is possible that the inconsistencies are
evidence of factitious behavior or malingering, but that a
factitious disorder seems more likely. (See id. at 67-68.) Dr.
Clayton also noted that it is "common" for those who regularly
use marijuana to have symptoms of paranoia, hallucinations,
symptoms of depression, anhedonia, and difficulty concentrating.
(See id. at 68.)

    Lita Berkshire, a vocational expert, also testified at the
hearing. (See id. at 77-84.)  She was asked if a person with the
following limitations can perform the work Plaintiff performed as

25

a valet: is able to read little English; can occasionally lift twenty pounds and frequently lift ten pounds; can stand six hours in an eight-hour day; can never climb ladders, ropes, and scaffolds; can occasionally stoop and crouch; must avoid concentrated exposure to vibration; and can perform simple routine tasks. (See id. at 80.)  Ms. Berkshire testified that this person could perform the job of a parking lot attendant, which involves light, unskilled work. (See id. at 79-80.)  If this person, however, experienced loss of concentration for twenty percent of the workday, he would be unable to perform Plaintiff's past job. (See id. at 80-81.)  She also testified that Plaintiff's past job was rated a skill level two because he was required to have a driver's license and memorize license plate numbers. (See id. at 82-83.)  This skill level, however, does not include using a cash register. (See id. at 82-83.)

## DISCUSSION

### I.   Legal Standard

Under the SSA, a person is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is not disabling unless it is "of such

26

severity that [a claimant] is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

In assessing a claim of disability, the Commissioner must consider the following factors: (1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) the claimant or other witnesses' subjective evidence of pain or disability; and (4) the claimant's educational background, age, and work experience. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

SSA regulations set forth a five-step sequence to evaluate disability claims. See 20 C.F.R. § 404.1520. The Second Circuit has explained the sequential evaluation process as follows:

> if the Commissioner determines (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003));

27

accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); see also 20 C.F.R. §§ 404.1520, 416.920.   Claimants bear the burden of proof with respect to the first four steps in the evaluation. See Perez, 77 F.3d at 46; Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).   The Commissioner must prove, at the fifth step, that the claimant can obtain substantial gainful employment in the national economy. See Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); see also Perez, 77 F.3d at 46 ("If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.").

In presiding over a hearing on disability benefits, an "ALJ generally has an affirmative obligation to develop the administrative record," given the non-adversarial nature of the proceedings. Perez, 77 F.3d at 46.   The ALJ must develop the plaintiff's "complete medical history" and make "every reasonable effort" to help the plaintiff get the required medical reports. See 20 C.F.R. § 404.1512(d); see also Perez, 77 F.3d at 47. Furthermore, "[i]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop

28

the administrative record accordingly." <u>Rosa</u>, 168 F.3d at 79 (quoting <u>Hartnett v. Apfel</u>, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998)); <u>accord</u> <u>Lopez v. Barnhart</u>, No. 05 Civ. 10635 (JSR), 2008 WL 1859563, at *13 (S.D.N.Y. Apr. 23, 2008).   Where an ALJ fails to adequately develop the administrative record, remand is appropriate. <u>See</u> <u>Rosa</u>, 168 F.3d at 83; <u>Culliane v. Sec'y of Dep't of Health and Human Servs.</u>, 728 F.2d 137, 139 (2d Cir. 1984).

Under the "treating physician rule," "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" <u>Burgess</u>, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)).   "'Medically acceptable clinical and laboratory diagnostic techniques' include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." <u>Id.</u> at 128 (internal quotation marks omitted).

When other substantial evidence in the record conflicts with a treating physician's opinion, that opinion need not be deemed controlling. <u>See</u> 20 C.F.R. §§ 404.1527(d)(1), (d)(4)-(6); <u>see also</u> <u>Halloran</u>, 362 F.3d at 32.   If the treating physician's opinion is not given controlling weight, the ALJ must consider

the following factors to ascertain what weight the opinion deserves: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the alternate opinion — the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. See Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r, 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998).

"[T]he Commissioner is required to provide 'good reasons' for the weight she gives to the treating source's opinion." Halloran, 362 F.3d at 32-33. The Second Circuit has stated,

> [w]e do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating [physician's] opinion and we will continue remanding when we encounter opinions from [ALJs] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.

Id. at 33.

When considering the Plaintiff's testimony, it is within the discretion of the ALJ to evaluate the credibility of the Plaintiff's complaints in light of medical findings and other

30

evidence. See 20 C.F.R. § 416.929 ("statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged"); see also Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) ("Where subjective symptoms are reported, the ALJ has discretion to evaluate the credibility of the claimant and to arrive at an independent judgment, in light of the medical findings and other evidence, regarding the true extent of the [symptoms] alleged."). If the ALJ decides to reject the subjective testimony of the claimant, she must do so explicitly and with sufficient specificity to enable a court to decide whether there are legitimate reasons for the ALJ's disbelief and whether her determination is supported by substantial evidence. Id.; see also Rivera v. Apfel, No. 94 Civ. 5222 (MBM), 1999 WL 138920, at *8 (S.D.N.Y. Mar. 15, 1999); Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998); Harrison v. Sec'y of Health and Human Servs., 901 F. Supp. 749, 757 (S.D.N.Y. 1995); Fishburn v. Sullivan, 802 F. Supp. 1018, 1027-1028 (S.D.N.Y. 1992.)

This Court reviews the administrative record and the ALJ's decision to determine whether it is supported by substantial

evidence and relies upon the correct legal standards. See 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004). "Substantial evidence . . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)) (internal quotations omitted). Where an ALJ's findings are based on substantial evidence, this Court must defer to them. See Barreto ex rel. Rivas v. Barnhart, No. 02 Civ. 4462 (LTS), 2004 WL 1672789, at *3 (S.D.N.Y. July 27, 2004) (citing Rosa, 168 F.3d at 77). However, a court "may not properly 'affirm an administrative action on grounds different from those considered by the agency.'" Burgess, 537 F.3d at 128 (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)). "[A]s the propriety of the agency's action is to be judged solely by the rationale it advances, 'that basis must be set forth with such clarity as to be understandable. It will not do for a court to . . . guess at the theory underlying the agency's action . . . .'" NLRB v. Columbia Univ., 541 F.2d 922, 930 (2d Cir. 1976) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S. Ct. 1575, 1577 (1947)); see also Hackett v. Barnhart, 475 F.3d 1166, 1174-75 (10th Cir. 2007) (applying Chenery in the social security context).

**II.  The ALJ's Decision**

Applying the five-step analysis established by SSA regulations, the ALJ found, first, that Plaintiff had not engaged in substantial gainful activity since December 15, 2005, the date he asserted he became disabled in his application for disability insurance benefits. (<u>See</u> R. at 11.)  The ALJ then found in the second step of the analysis that Plaintiff suffered from the following severe impairments: depressive disorder, cannabis abuse, cervical degeneration disc disease and mild lumbar degenerative disc disease. (<u>See</u> <u>id.</u> at 11.)  The ALJ found at the next step, however, that Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment in the regulations. (<u>See</u> <u>id.</u> at 11-23.)  Thus, the ALJ found that Plaintiff was not disabled. (<u>See</u> <u>id.</u> at 13.)  Next, the ALJ considered Plaintiff's residual functional capacity. (<u>See</u> <u>id.</u> at 15-23.)  In reviewing the record, the ALJ found that Plaintiff has the ability to lift and carry twenty pounds occasionally and ten pounds frequently. (<u>See</u> <u>id.</u>)  Plaintiff can stand, walk, and sit six hours in an eight-hour workday, occasionally stoop and crouch, but never climb ladders, ropes, and scaffolds. (<u>See</u> <u>id.</u>)  The ALJ further found that Plaintiff has the mental functional capacity to perform simple and routine tasks. (<u>See</u> <u>id.</u>)  The ALJ found that Plaintiff was

33

not a credible witness and that his alleged symptoms were inconsistent with his activities. (See id.) Lastly, the ALJ found that based on Plaintiff's residual functional capacity, he is able to work as a parking lot valet, but only as a driver. (See id. at 23.)

## III. Application of Legal Standard to ALJ's Decision

Plaintiff contends that he is disabled and unable to work because of mental health problems (specifically memory), lower back pain, and diabetes. (See Compl. ¶ 4.) Furthermore, Plaintiff contends that the ALJ's determination is not supported by substantial evidence and, therefore, the case should be remanded to the Commissioner solely for the calculation of benefits. (See Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, dated Sept. 29, 2010 ("Pl.'s Mem."), at 3, 7.)

In reaching the conclusion that Plaintiff is not physically or mentally disabled, the ALJ considered the evidence of his hypertension, headaches, fibromyalgia, cognitive disorder, cervical degenerative disc disease, mild lumbar degenerative disc disease, depressive disorder, and cannabis abuse. (See R. at 11-23.)

34

## A. The Severity of Plaintiff's Physical Impairments

The ALJ found that Plaintiff's hypertension was not severe. (See id. at 12.)   Plaintiff was diagnosed with uncontrolled hypertension in February 2007, but no other medical reports in the record contain a diagnosis of hypertension. (See id. at 248.) Similarly, the ALJ found that Plaintiff's headaches were not severe. (See id. at 12.)   Plaintiff complained of headaches in February 2007, however, there is no other evidence in the record to support the severity of Plaintiff's headaches. (See id. at 240, 248.)   The ALJ found that even though Dr. Anderson diagnosed Plaintiff with Fibromyalagia in June 2007, the diagnosis is not medically established because Plaintiff has not undergone formal evaluation or testing. (See id. at 12, 416.)

Next, the ALJ examined whether the pain Plaintiff complained of in his neck and back was severe. (See id. at 13-23.)   In March 1998, Plaintiff began to experience lower back pain after an automobile accident. (See id. at 296, 335.)   There are no medical records to support Plaintiff's complaints of back and neck pain from 1998 until 2004.[6]   The medical records show that it was not until May 2004 that Plaintiff again sought medical care for his back and neck pain due to the 1998 automobile accident. (See id.

_____

[6] There is no evidence in the record, including Plaintiff's hearing testimony, indicating that Plaintiff was unable to work as a valet because of back pain.

35

at 335-36.)    In January 2005, Plaintiff returned to HMC and reported that his back pain had worsened, especially when he stood. (See id. at 319.)   On March 30, 2007, Plaintiff visited Dr. Anderson and complained that he was experiencing intermittent neck and back pain that began about eight years earlier. (See id. at 417.)   In September 2007, Plaintiff told Dr. Anderson that he could not walk, work, or be with a woman due to his chronic lower back pain. (See id. at 411.)

The ALJ discredited Plaintiff's physical pain complaints because the record contains evidence of symptom magnification. (See id. at 17.)    Dr. Wainstein noted that when he simply massaged Plaintiff's lower back, "he almost jumped, supposedly because of severe pain." (See id. at 247.)    Mr. Nelson, a physical therapist, also reported that Plaintiff's complaints of pain were out of proportion to Plaintiff's diagnosis. (See id. at 421.)

The ALJ also found that Plaintiff's alleged symptoms were not supported by the objective findings in the record. (See id. at 17.)   Analyzing the objective findings in the record, the ALJ concluded that Plaintiff's alleged pain is severe, but not severe enough to qualify as a medical impairment that significantly limits Plaintiff's ability to perform work activities. (See id. at 13-23.)

36

In determining whether a physical impairment is severe, the ALJ must decide whether it is both medically determinable and results in significant limitations in the ability to perform basic work activities. See 20 C.F.R. §§ 416.908, 416.921.   The actions needed to perform basic physical work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. See 20 C.F.R. § 416.921(b)(1).

A CT scan of Plaintiff's spine showed degenerative disc disease; however, records from HMC do not indicate that Plaintiff is disabled by his pain. (See R. at 273-406.)   Dr. Anderson indicated that Plaintiff was very tight in his back muscles, but that he had no back or spine abnormalities. (See id. at 417.) Dr. Lee's DSM diagnosis revealed that Plaintiff suffered from chronic back pain. (See id. at 242.)   Also, Dr. Wainstein diagnosed Plaintiff with residual lower back pain and a diminished range of motion, but reported there were no signs of radiculopathy. (See id. at 247.)   At a later visit, Dr. Anderson reported that Plaintiff showed no evidence of physical pain. (See id. at 416.)   An x-ray of Plaintiff's spine showed there was mild post-traumatic or degenerative changes in his spinal region and possible left sacroilitis. (See id. at 428.) Subsequently, Dr. Jackson reported that Plaintiff's back, hips, lower extremities, gait, and station were within normal limits. (See id. at 514.)

37

Dr. Wainstein reported that Plaintiff showed no limitations or distress while sitting, walking, or standing up from a chair. (See id. at 245.)  Given Plaintiff's back condition and pain, Dr. Wainstein concluded that Plaintiff could stand, walk, and sit for about six hours a day. (See id. at 248.)  Dr. Bernardez-Fu reported that Plaintiff could frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, stand or walk for six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull an unlimited amount. (See id. at 252.)  Dr. Jackson, one of Plaintiff's own physicians, reported that there were no signs of limitations on Plaintiff's agility, mobility, flexibility, or non-exertional environmental or workplace restrictions, and his overall work level capabilities were "light" and with "limited hours."[7] (See id. at 513-15.)

Thus, the record provides substantial evidence to support the ALJ's conclusion that Plaintiff's back condition and pain is not a medically determinable physical impairment that significantly limits his ability to perform basic work

[7] "Light work means the ability to lift 20 pounds maximum and frequently lift and/or carry up to 10 pounds.  Even though the weight lifted may be negligible, light work may require walking or standing up to six (6) out of eight hours per day, or involve sitting most of the time with occasional pushing and pulling of arm and/or leg controls." (Id. at 513-15.)

activities.   The ALJ properly found that Plaintiff has the
residual physical functional capacity to occasionally lift and
carry twenty pounds, frequently carry ten pounds, stand and walk
six hours in an eight-hour workday, and sit six hours in an
eight-hour workday with normal breaks  (See id. at 15.)

### B. The Severity of Plaintiff's Mental Impairments

#### 1. Applicable Law

"In addition to the five-step analysis . . . the
Commissioner has promulgated additional regulations governing
evaluations of the severity of mental impairments." Kohler v.
Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §
404.1520a.  At the second and third steps of the framework, the
regulations require that each level of administrative review
apply a "special technique." Kohler, 546 F.3d at 265 (citing
Schmidt v. Astrue, 496 F.3d 833, 844 n.4 (7th Cir. 2007)); see
also 20 C.F.R. § 404.1520a(a).  The "special technique" first
requires that the reviewing authorities determine whether
Plaintiff has a "medically determinable mental impairment." 20
C.F.R. § 404.1520a(b)(1).  "If the claimant is found to have such
an impairment, the reviewing authority must rate the degree of
functional limitation resulting from the impairment(s)." Kohler,
546 F.3d at 266 (internal quotation marks omitted); see also 20
C.F.R. § 404.1520a(b)(2).  In rating the degree of functional

limitation, the reviewing authority must consider the following functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. § 404.1520a(c)(3).

"According to the regulations, if the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(1). "If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2). "If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity." Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(3). The regulations require that this process be documented, and that a medical or psychological consultant generally complete a Psychiatric Review Technique at the initial and reconsideration levels. See 20 C.F.R. § 404.1520a(e)-(e)(1).

40

A claimant's residual functional capacity is the most the claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a)(1).   The assessment of a claimant's residual functional capacity is based on all of the relevant evidence in the record. See id.   A claimant's mental residual functional capacity is based on his ability to conduct basic work-related activities on a continuing basis. See 20 C.F.R. § 404.1545(c). "A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work." See id.

    2. ALJ Error

The ALJ considered the objective medical findings on the severity of Plaintiff's mental condition, evaluated the medical evidence in both the second and third steps of the analysis, and concluded that Plaintiff's mental and psychiatric conditions did not limit his ability to perform his past work as a car valet. (See R. at 6-24.)   The Court concludes that the ALJ's findings were not supported by substantial evidence and that a remand is appropriate for further development of the record.

In step two of the five-step analysis, the ALJ found that Plaintiff suffers from a depressive disorder, a severe impairment

41

that "causes significant limitations on Plaintiff's ability to perform basic work activities." (Id. at 11.)   The ALJ decided, however, that Plaintiff's diagnosed cognitive disorder is "not medically established." (Id. at 12.)   The ALJ based this determination on "the lack of any clear etiology for the claimant's alleged cognitive disorder, his inconsistent performances on mental status examinations, his activities, and his poor credibility." (Id. at 13.)   In reaching her conclusions, the ALJ ignored the diagnoses of the three consulting sources, two of whom examined Plaintiff on a single occasion, while the third evaluated Plaintiff on two occasions in two different years.

Dr. Lee diagnosed Plaintiff with "cognitive disorder due to traumatic brain injury". (Id. at 241.)   He found Plaintiff's concentration, persistence, and pace during the interview to be poor, and his three-step command to be poor.  He concluded that Plaintiff's ability to manage funds, to perform simple and repetitive tasks, perform detailed and complex tasks, and to accept instructions from supervisors to be poor.  Further, he evaluated Plaintiff's ability to interact with coworkers, perform activities on a consistent basis, and maintain regular attendance in the workplace as likely to be severely affected.  He noted that Plaintiff's limited abilities were due to his cognitive

42

ability, but may also be related to psychotic depression.   Dr. Lee found that Plaintiff had a GAF of 40.[8]

Dr. Carstens also diagnosed Plaintiff with a "cognitive disorder NOS (provisional)," and determined after two separate evaluations in different years that Plaintiff had a GAF of 45.[9] (Id. at 489.)   Dr. Quinci diagnosed Plaintiff with a "moderate cognitive impairment, in addition to atypical psychosis," and evaluated Plaintiff's GAF to be 47. (Id. at 509.)

The ALJ chose to disregard these findings because she concluded the cognitive impairment was not "medically established" as (1) there was no evidence that Plaintiff experienced traumatic brain injury in his car accident; (2) the mental examination results were worthy of minimal weight because Plaintiff performed inconsistently on them; (3) to the extent that the examiners relied on Plaintiff's subjective complaints and descriptions, Plaintiff was not credible; and (4) Dr. Haney's and Dr. Clayton's opinions were entitled to acceptance.   The

---

[8] GAF 31-40 is defined as "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR, at 34.
[9] GAF 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR, at 34.

Court concludes that, in effect, the ALJ substituted her own diagnosis for those of three psychiatric professionals.

Even assuming that Plaintiff's car accident did not cause a traumatic brain injury, the ALJ ignored the possibility that Plaintiff has a cognitive impairment that arose out of a different cause and on a different onset date.  Only Dr. Lee's opinion mentioned a traumatic injury as the etiology of the cognitive impairment; neither Dr. Carstens's opinion nor Dr. Quinci's opinion mentioned causation. For the ALJ to disregard the opinions of three different consulting sources, because she did not find what one of them suggested as the causative factor for Plaintiff's cognitive impairment to be valid, was error.

"The ALJ generally has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). The ALJ must seek additional evidence or clarification when the "report from [plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1512(e)(1).  "In short, if a physician's report is believed to be insufficiently explained,

44

lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." Ureña-Perez v. Astrue, No. 06 Civ. 2589 (JGK) (MHD), 2009 WL 1726217, at *29 (S.D.N.Y. Jan. 6, 2009); see also Shaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information . . . sua sponte") (emphasis in original); see also Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("The regulations also state that, '[w]hen the evidence we receive from your treating physician . . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available.' 20 C.F.R. §404.1512(e).") (emphasis added).

To the extent the ALJ believed that the basis for Dr. Lee's opinion about the cause of Plaintiff's cognitive disability was not supported by the record, she had an obligation to develop the record by contacting Dr. Lee. If the ALJ did not believe it was medically established that the automobile accident could have caused the cognitive impairment, before completely dismissing the diagnosis she had an affirmative obligation to contact Dr. Lee

45

and inquire whether the impairment could have had another cause
and onset date.   While the ALJ retains discretion to assess the
credibility of a claimant's testimony regarding [the severity of
his symptoms] and to "arrive at an independent judgment, in light
of medical findings and other evidence, regarding the true extent
of the [limitations] alleged by the claimant," Marcus v.
Califano, 615 F.2d 23, 27 (2d Cir. 1979), it is "well-settled
that an ALJ cannot substitute her own judgment for that of a
medical professional." Gunter v. Comm'r of Soc. Sec., 361 Fed.
App'x 197, 199 (2d Cir. 2010).   Accordingly, while the ALJ was
entitled to evaluate Plaintiff's credibility regarding the extent
of his symptoms, she was not entitled to completely discount
medical opinions that were based on more than just Plaintiff's
self-reporting.

Dr. Lee performed an evaluation of Plaintiff, by taking both
his personal and psychiatric history, as well as by conducting a
mental status evaluation that consisted of testing and observing
Plaintiff. (See R. at 239-42.)   For example, Dr. Lee wrote that
Plaintiff "seemed to be focused on something else and staring in
space at times during the interview with poor concentration" (id.
at 240), and that Plaintiff had a "significant latency in his
speech" (id. at 241).   Dr. Lee also noted that Plaintiff "answers
questions in a goal directed fashion when they were repeated

46

because it seemed like his concentration was not very good." (Id. at 241.)  He found that Plaintiff's three-step command was poor. Dr. Lee evaluated Plaintiff's GAF to be 40. (See id. at 242.)

Similarly, Dr. Carstens did two psychiatric/psychological evaluations of Plaintiff — one in 2007 and one in 2009. In Dr. Carstens's evaluations, she described Plaintiff as: "cognitively, he showed lapses in memory for recent and remote events. He demonstrated limited insight and social judgment." (Id. at 496.) In addition, Dr. Carstens noted in her mental status evaluations that his affect was flat (see id. at 492) and blunted (see id. at 498), his mood was depressed and anxious (see id. at 492, 498), and he had impaired calculation, concentration, and abstract thinking (see id. at 498).  Plaintiff scored 14 out of 30 on a mental status exam, indicating markedly compromised cognitive functioning.  He had difficulty recalling 3 out of 3 items immediately, and could not recall any items after three minutes. Dr. Carstens evaluated Plaintiff to have a GAF of 45. (See id. at 489, 495.)  The ALJ did not mention or consider the extremely low GAF scores found by Dr. Lee and Dr. Carstens.   In 2009, Dr. Carstens diagnosed Plaintiff with a non-specified psychotic disorder, in addition to his cognitive impairment.   Dr. Carstens's evaluation of Plaintiff was based on his performance on cognitive and psychological tests, in addition to her

47

observation of Plaintiff.   The fact that Plaintiff may not have had a traumatic brain injury does not render the testing and subsequent findings by Drs. Lee and Carstens irrelevant.   The ALJ should have contacted Dr. Carstens and Dr. Lee to determine whether there were other possible causes of the cognitive impairment they diagnosed, and how the elimination of a traumatic brain injury would have affected their conclusions.

The same is true for Dr. Quinci, who conducted a psychiatric/psychological evaluation of Plaintiff in 2008.   Dr. Quinci also found that Plaintiff had moderate cognitive impairment, in addition to an atypical psychosis.   As with the other two examining sources, the ALJ simply rejected Dr. Quinci's conclusions because she concluded that Plaintiff did not suffer from a traumatic brain injury.

The ALJ was entitled to find that Plaintiff was not credible, and, thus, that the medical and psychiatric histories he recounted to the consulting sources were not credible; but she was not entitled to disregard their professional opinions and diagnoses when there were other objective bases for their diagnoses in the record.   In fact, of the inconsistencies in Plaintiff's reporting noted by the ALJ, few relate to Plaintiff's psychiatric history and symptoms (see id. at 17-18), while the majority relate to his personal life history (for example, the

48

level of his education and the age of his children) (see id. at
18-19).  There is a difference between finding someone to lack
credibility regarding the severity of his symptoms, and finding
someone to be a poor historian.  Plaintiff had nothing to gain by
giving different medical sources inconsistent information about
his children and education.   Even if the ALJ believed that
Plaintiff's lack of credibility corrupted these diagnoses,
however, she had the affirmative duty to contact the consulting
sources and inquire if their diagnoses would stand without the
history Plaintiff recounted to them.  Upon remand, in considering
Plaintiff's inconsistent statements, the ALJ should look to
whether the inconsistencies relate to the severity of Plaintiff's
disorders, or whether they are unrelated.   In addition, the ALJ
should reexamine whether the inconsistencies may have been
magnified by a language barrier as well as a cognitive
impairment.

Similarly, simply because Plaintiff performed differently on
different cognitive tests was not a proper basis for the ALJ to
disregard the clinical testing that had been done.
Notwithstanding the inconsistencies, each of the consulting
sources independently concluded, after testing Plaintiff, that he
had a cognitive impairment.   If the ALJ thought that the
inconsistencies rendered their diagnoses questionable, she was

49

obligated to ask the professionals to either reconcile the inconsistencies or opine on whether the inconsistencies led them to reconsider their diagnoses.   It may be that they serve to undermine Plaintiff's claim, or they may be yet further evidence of a cognitive impairment.   This is for the examining sources, and not the ALJ, to determine.   In addition, the psychological experts should be asked to opine on the effect of a language barrier on the mental status evaluations and inconsistent results.

To the extent that the ALJ relied on the opinions of Drs. Clayton and Haney in concluding that Plaintiff did not have a cognitive impairment, her reliance was misplaced.   Dr. Haney opined that the finding of a cognitive impairment was not credible because there was no evidence that Plaintiff suffered traumatic brain injury in his 1998 car accident.   But, regardless of causation, Dr. Haney was in no position to opine on whether Plaintiff had a cognitive impairment.   He never met or evaluated Plaintiff personally.   Thus, he had no basis to draw any conclusions about Plaintiff's cognitive functioning.   Although Dr. Clayton attempted to give a more thoughtful assessment of Plaintiff's cognitive functioning, she too did not interview or evaluate Plaintiff, and thus, was not well-positioned to opine on Plaintiff's cognitive capacity.   "A psychiatric opinion based on

50

a face-to-face interview with the patient is more reliable than an opinion based on a review of a cold, medical record and, as in this instance, the observation of plaintiff while giving his testimony at his disability hearing." <u>Velazquez v. Barnhart</u>, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007). Thus, "[i]n the context of a psychiatric disability diagnosis, it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." <u>Id.</u> Accordingly, "the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little, if any, weight." <u>Filocomo v. Charter</u>, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996).

In any event, even Dr. Clayton found it difficult to reconcile the inconsistencies in the record relating to Plaintiff's memory difficulties; she was unwilling to say that he was malingering, and thought that there was a possibility that some of Plaintiff's memory issues were related to stress. (<u>See</u> R. at 67-68.)

In sum, the ALJ's conclusion that Plaintiff did not have a cognitive impairment involved an improper substitution of her opinion for the professional opinions of consulting sources who administered cognitive tests and, thus, had objective medical

51

evidence to support their conclusions.  While it is true that the opinion of a consultative physician "should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist", Hernandez v. Astrue, No. 10 Civ. 0234 (KAM), 2011 WL 1630847, at *10 (E.D.N.Y. Apr. 29, 2011), it should certainly be given more weight than that of a non-examining, nontreating source who merely conducts a paper review.

The ALJ's conclusion in this respect was not supported by substantial evidence, and she failed in her affirmative duty to develop the record by seeking clarification and further explanations from the consulting sources who examined Plaintiff.

The ALJ committed similar error in evaluating the severity of Plaintiff's mental impairments and in determining Plaintiff's residual functional capacity.  In evaluating the severity of Plaintiff's depressive disorder, which the ALJ acknowledged to be severe, the ALJ chose to rely on the assessments of Drs. Haney and Clayton, two non-examining, nontreating sources, and discounted the opinions of the three consulting sources who interviewed, evaluated, and tested Plaintiff.  This was error sufficient for remand.

The ALJ accorded "significant weight" to the State Agency opinion.  (Id. at 13.)  Dr. Haney wrote this opinion after he merely reviewed Plaintiff's medical history (but had no

52

interaction with Plaintiff), and it was "affirmed by another State agency psychological consultant, Kent Reade, Ph.D.," who also never examined Plaintiff. (Id.) The ALJ also accorded "significant weight" to Dr. Clayton's "Part B" findings. (Id. at 14.)  Dr. Clayton is a psychological expert and reviewed Plaintiff's file (id.), observed him testify at the ALJ hearing (id. at 64) and testified herself at the hearing (id. at 63-77); but she never examined Plaintiff.

The ALJ erred by rejecting the assessments of three examining sources and affording "significant weight" to the opinions of Dr. Haney and Dr. Clayton, both of whom were nontreating, non-examining sources. See Lopez-Tiru v. Astrue, No. 09 Civ. 1638 (ARR), 2011 WL 1748515 at *5 (E.D.N.Y. May 5, 2011) (finding that ALJ erred in giving "great weight" to testimony of non-examining, not treating physician, as that testimony was entitled to little, if any, weight).

The ALJ also erred in discounting Dr. Carstens's opinion regarding the extent of the severity of Plaintiff's mental impairments. The ALJ rejected this opinion based on the lack of a "medically established" cognitive disorder, Plaintiff's "inconsistent performances on mental status evaluations", both already addressed, and the fact that Plaintiff has not been hospitalized for any psychiatric problems, which the ALJ

considered to be sufficient to find "no evidence of any episodes
of decompensation." (R. at 14.)

Episodes of decompensation are defined in 20 C.F.R. Part
404, Subpart P, Appendix 1 12.00(C)(4) as being:

> "exacerbations or temporary increases in symptoms or
> signs accompanied by a loss of adaptive functioning, as
> manifested by difficulties in performing activities of
> daily living, maintaining social relationships, or
> maintaining concentration, persistence, or pace.
> Episodes of decompensation may be demonstrated by an
> exacerbation in symptoms or signs that would ordinarily
> require increased treatment or a less stressful
> situation (or a combination of the two)."

Episodes of decompensation "may be inferred from medical records
showing significant alteration in medication; or documentation of
the need for a more structured psychological support system
(e.g., hositalizations)," but evidence of hospitalization is not
necessary to diagnose periods of decompensation. Id. (emphasis
added).   If the ALJ needed further clarification as to how Dr.
Carstens reached the determination that Plaintiff suffered from
"continual" episodes of decompensation, it was her affirmative
duty to contact Dr. Carstens and get further explanation. (See R.
at 500.)   The ALJ is not free to simply dismiss that conclusion
because Plaintiff was only hospitalized one time, in 2004.   In
fact, there was evidence in the record that, at various times,
Plaintiff's medications were changed and their dosages were

54

increased. (See, e.g., id. at 233, 323, 375, 378, 380, 383, 385, 388, 394.)

In addition, in determining Plaintiff's restrictions in activities of daily living, in social functioning, and with regard to concentration, persistence or pace, the ALJ misconstrued the record. One reason the ALJ cited for finding that Plaintiff only has "mild restriction" in activities of daily living is: "Of note is that the claimant was living by himself in New York City for a period in 2008" (id. at 14), while the exhibit cited states that Plaintiff was "living in New York City with a traditional healer and getting help" (id. at 434) (emphasis added). Similarly, in determining that Plaintiff has only "mild difficulties" in social functioning, the ALJ notes he "has friends [and] spends a lot of time with his cousin". (Id. at 15.) Plaintiff testified, however, that: "My friend, he just cook. My cousin." (Id. at 40.) Plaintiff also testified that his cousin helps him clean his house (id. at 44), his friend tells him when he needs to shower (id. at 44-45), that he stays with his cousin when he has to "stay with someone before [he] kill[s] himself" (id. at 62), and that "my friend – my cousin help me out, treats, get medicine" (id.). These examples, which demonstrate Plaintiff's need for assistance in performing daily living activities, are hardly evidence of normal social

55

functioning, and shed little light on Plaintiff's ability to deal with the stresses of work or interact with superiors and coworkers.

The examining sources all concluded that Plaintiff's ability to deal with the stresses of work and interact with superiors was severely limited. Dr. Lee wrote that Plaintiff's ability to accept instructions from supervisors is poor, and his ability to interact with coworkers, his ability to perform work activities on a consistent basis, and his ability to maintain regular attendance in the workplace would all likely be affected to a severe degree. (See id. at 242.)   Dr. Carstens evaluated Plaintiff as having marked difficulties in his ability to relate appropriately to co-workers and supervisors and his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting. (See id. at 490.)   Dr. Quinci also evaluated Plaintiff's ability to respond appropriately to, and tolerate the pressures and expectations of, the work setting as markedly limited. (See id. at 506.)   Indeed, even Dr. Clayton, whose views the ALJ largely adopted, concluded that Plaintiff's ability to interact appropriately with the public was moderately impaired. (See id. at 543.)   Yet, the ALJ chose to reject that conclusion. (See id. at 23.)

Furthermore, the ALJ found that Plaintiff had only "occasional problems with psychotic symptoms" (id. at 15), minimizing a record that is replete with various medical professionals expressing serious concern about Plaintiff's mental status and diagnosing severe mental disorders (see, e.g., id. at 215, 217, 225, 241-242, 275, 298, 328, 393, 432, 434, 446). The Court acknowledges that this is not the easiest record to parse, as Plaintiff did not have a consistent treating psychiatrist during the period in question.  It seems indisputable, however, that Plaintiff has a long history of auditory hallucinations, insomnia, and nightmares, and has been given serious medications for these conditions, including Risperidone, Zoloft, and Trazodone. (See id. at 233.)

Finally, the ALJ appears to have assumed that because Plaintiff had driven cars prior to 2005 or 2006, he was capable of returning to his job as a valet parking attendant.  (See id. at 23.)  None of the psychological or medical experts, however, were asked about, or expressed an opinion about, whether Plaintiff should be driving while taking the combination of psychotropic medications he has been prescribed, and while he is susceptible to auditory hallucinations and insomnia.  The failure to develop the record in this regard leads the Court to conclude that the ALJ's decision that Plaintiff could perform his former

work is not supported by substantial evidence.  In determining
whether Plaintiff is capable of returning to his previous job as
a parking lot attendant, it is incumbent upon the ALJ to
determine, from either an evaluating or treating source, or a
psychopharmacologist, whether Plaintiff should be driving cars
while taking the combination of psychotropic medications that he
has been prescribed.  The ALJ's failure to address this critical
point was error.

\* \* \*

The Court is not in the position to conclude that the record
conclusively establishes that Plaintiff is disabled. The Court
recognizes that there are inconsistencies and gaps in the record,
and that different professionals have come to different
conclusions about Plaintiff's impairments and their severity. For
all these reasons, there is a need to further develop the record
in this case.

The Court recommends that, upon remand, the ALJ should
reconsider her conclusions in light of this Opinion.  She should
give appropriate weight to the opinions of Dr. Lee, Dr. Quinci,
and Dr. Carstens, and she should take into consideration
Plaintiff's GAF ratings, which indicate a serious impairment.  To
the extent that the ALJ believes that Dr. Lee's, Dr. Quinci's,
and Dr. Carstens's conclusions are not supported by clinical

58

findings, or are called into question by other evidence in the record they were unaware of, the ALJ should contact them to fill any gaps in the record and to elicit their views on Plaintiff's ability to drive and, therefore, work as a valet.   The ALJ may also choose to have Plaintiff examined by another consultant, who is made aware of the complete record.

**CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that (1) the Commissioner's motion for judgment on the pleadings be denied, (2) Plaintiff's cross-motion be granted in part, and (3) the case be remanded for further development of the record and reconsideration in light of the record.   Under 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d).   Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Laura T. Swain, U.S.D.J., and to the chambers of the undersigned, Room 1660.   Any requests for an extension of time for filing objections must be directed to Judge Swain. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 149-52, 106 S. Ct. 466, 472-73 (1985); IUE AFL-CIO Pension Fund

<u>v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:   August 9, 2011
         New York, New York

60